This is the small business Camden County matter, and I believe that, is it Durand? Am I pronouncing it right? Jenny's Durand, yes. Jenny is the strange first name. Right, right. Okay, Mr. Durand, come on down. Would you like to reserve any time for a bow, sir? Well, actually, good morning. I'm going to be introducing Lauren Bennett, who is a recent graduate of the University of Pennsylvania Law School. Okay. I'm Jenny's Durand with Deckard LLP, and I'm here with Carolyn Hazard, my colleague. Don't go back to Deckard and tell him your name, please. He didn't want to listen. Okay. And we've supervised Ms. Bennett's work throughout this process. And so tomorrow at 4623, Ms. Bennett is going to give a lecture today. Wonderful. Thank you so much. Would you like to reserve any time? Yes, Your Honor. I would like to reserve three minutes for a bow at the class commission. Very well. That's granted. Go ahead. Thank you. May it please the Court, my name is Lauren Bennett, and I'm here on behalf of your client, Robert Smith, today. Your Honors, this case is about a paraplegic inmate who made repeated complaints about prison officials' deprivation of his medically necessary wheelchair. The repeated complaints were completely unanswered, and he has now been denied access to the federal courts. The Camden County Correctional Facility Inmate Handbook outlines the grievance procedure at issue today and was reproduced for Your Honors at page 675 of the joint appendix. The handbook outlines two ways an inmate may file grievance with the correctional facility. The first way an inmate may file grievance is to do so on an official grievance form and turn that over to a grievance officer for review and resolution. Alternatively, an inmate may file a grievance on plain paper and also turn that into a grievance officer for review and resolution. Both of those grievances have to be submitted within 15 days of an incident occurring, which was grieving. Now, with respect to the appeals process, the inmate handbook provides that if the inmate is not satisfied with the grievance officer's decision, the inmate may appeal that decision to the warden in writing in 10 days. So is your view of the district court's error that the district court assumed that given no response, there was an obligation or responsibility on Mr. Small's part to then appeal? Yes, Your Honor. Our position is that the district court erred in reading in language in the handbook that is not there with respect to what to do when an inmate receives no response at all. On at least one occasion, Small filed an appeal directly to the warden in connection with a grievance to which he had not received a response. If he did that once, why shouldn't he assume that he could do it again? Your Honor, because that is not what the language of the handbook commands Mr. Small to do. And he did it. But he only had to do it, Your Honor, to the extent he received an unfavorable decision from a grievance officer, which he never received here. So whether he called the warden that he wrote an appeal or a grievance, whatever he deemed it, it could still only be an appeal to the extent it was appealing an unsatisfactory decision issued by a grievance officer, which in this case he never received. The handbook is silent on what, if anything, he should do if there is no decision. So you are more than a non-response. I see it as undisputed that there were no decisions as to any of the 14 grievances issued in the amended complaint, correct?  So how does one appeal a non-decision? One cannot. What are you appealing? Exactly, Your Honor. There is nothing to appeal. And that's why the district court erred in mandating an appeals process on Mr. Small that simply was not available to him in this case. Now, I've looked at these incidents, the 14 of them, quite closely. It seems to me, and I don't know if I want to pin myself to three, but there were three that Judge Bond dismissed because there was no appeal, correct? I mean, there were different grounds to dismiss certain of them. But there were three, and maybe nearly two, the June 18, 2005 and the June 28, 2005. They took the wheelchair. Yes, they took the wheelchair. But they were formally grieved and they were dismissed specifically because no appeal had been taken, correct? Correct, Your Honor. But there was no decision on either one. Correct, Your Honor. Therefore, there is nothing for Mr. Small to appeal. And that is one of the reasons that the district court erred below. Now, one of the other reasons the district court erred below, Your Honors, is that the district court found that administrative remedies were available to Mr. Small. When a prison official does not timely respond to an inmate's grievances, it renders the administrative remedial scheme unavailable to that prisoner. So the Seventh Circuit in Lewis v. Washington stated, as the Eighth Circuit, that if a prison does not respond to an inmate's grievances, the administrative scheme is not available to them. And that is exactly what happened here, Your Honors. Magda, you argue that there are, I believe, three or four instances where we should invoke the continuing violation theory that you propose. If we don't buy the continuing violation theory, do those claims go by the board? Yes, Your Honor. As to the July 8th and July 10th incidents, but as to everything that occurred before in 2005, from 2004 to 2006, before July 8th. So any time before July 8th, all those claims would still stay if this court finds that the continuing violation doctrine does not apply. Okay, let me ask you just to clear the record a little bit, or at least the briefing. We observed that in 2006, I just picked that up. You mean 2006 only, this is going to be my question. That the continuing violation theory only applies to incidents from April 13th, 2006 forward. I get that to mean that you're not really complaining about the 2005 ones in terms of the continuing violation doctrine, is that correct? That is correct, Your Honor. So why are you doing, for purposes of that doctrine, from April 13th, 2006 forward? Yes, Your Honor. How could there be a continuing violation here when Small's repeated misuse of his wheelchair caused prison officials to take it away? That's why they took it away. But, Your Honor, in taking his wheelchair away, they were depriving him of what was medically necessary to him, and that is the violation. That is the deliberate indifference. But he misused it. Your Honor, respectfully, that is not, in fact, for purposes of whether or not he exhausted those particular incidents with the prison officials. It is important, Your Honor, in the August 14th, 2006 letter to the Warren, bringing the over one month deprivation of his wheelchair with leg rest, he was without his medically necessary leg rest for over one month. What should they do, what should a prison official do when the prisoner misuses his wheelchair? I mean, what are they supposed to do? Well, Your Honor, I'm not quite sure on the agenda and the jurisprudence, but taking away a paraplegic's wheelchair for punitive reasons, so to speak. For punitive reasons, it was broken. And they replaced it, in most of those incidents, with one that didn't have a leg rest. He came into the zone with a leg rest because he needed leg rest. But this was an emergency situation. They had to put him in a wheelchair. Now, is it a violation of a constitutional right because you just happen to have an extra one with a leg rest waiting for him when he smashes it the next time? I don't know if that's any seamless expansion of constitution. Well, I think that's not necessarily relevant to whether he's exhausted his crime meritorious or, I mean, the non-meritorious that it may be, correct? Which is why they do it in those places. He was not a model prisoner, right? Certainly not, Your Honor. That's not relevant to whether or not he exhausted his administrative remedies with the prison officials. Aren't you conflating a recurring incident or a recurring theme with continuing violation? I mean, continuing violation in other jurisprudences, the same thing happens in the same instance. And we're going to allow an extension of the time in which we're going to permit a claim to stand. I mean, here these are separate incidents. They're disparate. They have a similarity. Yes, it's the wheelchair. Yes, it's no leg rest. But isn't it really different than continuing violation jurisprudence? Well, Your Honor, not particularly in this case as to what happened to Mr. Small from July 8, 2006 onward. Because Mr. Small, in his August letter to the Warren, again, wrote that he had been without his medically necessary wheelchair with leg rests for a little over a month now was the language he used. So each day that he was deprived of it, that was the continuous deprivation there of the wheelchair with leg rests. Neither of those wheelchair incidents, I think I cited two of them before, July 18th and 28th of 2005, are not invoked in terms of the continuing violation, Doctor. So we could deal with a wheelchair situation without it reaching any continuing violation theory, couldn't we? Certainly, Your Honor. I don't mean to suggest we would want to duck it, but... No, certainly, Your Honor. He's dry, I don't know. So whether or not this court does find that there was a continuing violation, Mr. Small still exhausted all of the administrative remedies that were available to him. And the only way that he was able to do that was that he substantially complied with the grievance procedure in issue today.  No. Thank you. What about the instance where the lieutenant, I forget, Taylor, who says, on those instances where he wrote to the warden, I went and spoke to him specifically about it. Doesn't that constitute a response? Your Honor, it doesn't constitute a response for two reasons. The first is that Lieutenant Taylor also testified that it was the practice of the prison to respond to grievances in writing. And I would direct Your Honor to the grievance forms themselves in the joint appendix on page 801. The grievance forms themselves contemplate a response. There's a box for findings by the grievance officer and a box for the response. So it was the practice to respond in writing, not word. Notwithstanding that, if the warden's visits do constitute a response, it's disputed whether or not the warden went to see Mr. Small in response to his grievances or whether he was doing that as part of a routine tour. On cross-examination in the testimony below, Lieutenant Taylor stated that it was the practice of the warden and Sergeant Adkins to do biweekly routine tours and go up and down the ward speaking to prisoners. So it's not clear why the warden went to visit him, whether it was in response to a grievance or just because it was the practice to visit prisoners. Well, I think it's fair to say that the grievance procedure in terms of what is outlined in the handbook doesn't use the word response. It uses the word decision. So even if the warden talks to him about something and you question that issue, the handbook for purposes of appealing requires a decision. That is exactly correct, Your Honors. What is it that you want us to do? I guess I'd reverse. Reverse, find that Mr. Small did exhaust his administrative remedies and demand that the district court consider his claims on the merits. On the merits, what is it that you're asking the district court to do on the merits? To find that Mr. Small's eighth amendment rights were violated. And therefore, do what? Give him lots of money? He does request monetary relief, Your Honors. We would agree this could be an appropriate subject for summary judgment. Exhaustion or his claims? No, his claims on the merits. I mean, I don't know what facts there are on the merits. Your Honor, I don't see them there. Oh, it's a disguise. Completely. Correct, Your Honor. Do you believe on summary judgment Mr. Small will prevail on the merits given the eighth amendment jurisprudence? I think he should get money. Is that what you want? A person who has misused the wheelchair to the – I mean, I think we can assume that. We have no basis not to get money from the government. Is that what we're asking for? Your Honor, not quite. I'm asking for a paraplegic inmate whose wheelchair was confiscated from him because he misused it, perhaps at times. But at the end of the day, a paraplegic inmate should not be deprived of his wheelchair because he has it now, has it given back to him. He does have it now. He's in a different correctional facility now. Yes. Your Honor, does he need to have his evidence? Or do we have to put it in his record? It's act time now. Oh, I'm so sorry. I'm so sorry. I don't know what's in the intent of this case. Your Honor, I was not really as sweet as you are. I would have chopped you off at the moment. With reference to the handbook and his possession, lack of possession, the district judge didn't believe the story in the handbook at all and found that even if he actually possessed it, he didn't possess it. He never presented it. And we didn't see a number of grievances involved. Anyway, the district judge mentioned once in passing in your opinion that one of the reasons for not finding him credible in terms of the handbook is that he was in and out of this facility a number of times. A number of times. And each time under the regulations, every time you admit it, you take a handbook. So he never got it no matter how many admissions. How many times was he admitted, pre-admitted to the facility during the period of issue here? Do you know? So he was admitted beginning in 2002. He was admitted on five separate occasions. At issue here are his admittances from 2004 to 2008. So there were three of those. So at issue here there were three times he was admitted. And he also presumably got a handbook from 2000. Do you know what I mean by that word? Yes. If they were in his multiple MP files, which in this case the Lieutenant Taylor testified that the signed receipt for the handbook was missing. There's no signed receipt for any of them. I just didn't know how many there would be. Correct. There was three of them. That report isn't relevant anyway because he complied and they didn't. Correct, Your Honor. Okay. Thank you, Your Honors. Good morning. Good morning, Your Honor. Good morning, Your Honor. My name is Anne Walters, Assistant County Counsel for the County of Camden. I represent the County of Camden, the jail itself, and the multitude of individual named defendants on the cover of my brief. If I name them all, I'm going to lose all of my time. So. There's quite a few. Yes. Your Honor, I would prefer to raise this. Yes. Just a few points I'd like to raise to the court. Just a few? Just a few. Mr. Small was in our jail on numerous, numerous occasions. In 2002, in 2003, in 2004, and then from 2005 until 2008, he knew what he was doing. He testified to the court below and the judge made a credibility determination that he knew the grievance policy, that he knew that he could file an appeal. What does that have to do with the fact that there have been no responses that we can discern from record? Well, I have a few responses to that, Your Honor. Number one is that the grievance policy itself allows for an informal resolution within 72 hours. And it's not saying informal resolution. In some situations, it appears that there was, because in one case, he has a wheelchair back within 24 hours. Right. Right. Right. Right. Right. Right. Right. Right. Right. Right. Right. Right. Right. Right. Right. Right. Right. Right. Right. Right.  Right. Right. Right. Right. You all know the policy please, on 674, 675. The policy paragraph. Informal. It. Is an informal, informal. If you're encouraged, I'm looking at this record, page 675. If you're not encouraged, It is the second paragraph on the record of 675. Thank you. If you're encouraged to resolve grievances informally by losing the grievances to a staff member. I'm looking at this. It has nothing to do with response. I'm sorry. Well, I'm saying that in some cases they may have been resolved informally.  Which is what I was talking about. Okay. Yeah. And if you jump down to the last paragraph of the grievance policy, it talks about the grievance is not received in 72 hours. It will be turned to the grievance officer for review and resolution. That's not a good paragraph for you, is it? You need a written decision here, arguably. It may file a formal written grievance within 15 days. Correct. Correct. But the way I understand it is if it's not resolved, then the shift commander or the other will obtain the grievance. And then they have 72 hours to resolve it. And in some cases, Mr. Small got his wheelchair back. You can't be arguing that the onus is on the inmate if he doesn't hear to go right to the warden. I can't believe that the warden wants to be burdened every time a grievance is filed by an inmate that isn't responded to in 10 days. The last paragraph says nothing about a period where there's no decision. That's correct, Your Honor. But Mr. Small knew. He knew that he could appeal to the warden. He testified as such during the hearing that he could appeal to the warden even if he did not receive a response. On page 841 of the record for that proposition, one letter. He wrote a letter to the warden. But despite his testimony on that point, that is inconsistent with your policy. So what are we to do? Are we to say, hey, well, Small said he knew, but our policy doesn't say that. But in many cases, Your Honor, these grievances were resolved. He got his wheelchair back within the time that would have taken them to respond back to him. There was no resolution required. Well, let's say for a moment we don't agree, but let's say for a moment we assented that. That's either 4 or 5 out of 14. What's the issue with regard to the other remaining claims that were responded to and certainly not with a written decision? I believe that of the remaining claims, most of them were scenario dismissed by the lower court because they were not even grieved in the first place. And to the extent that he's attempting to argue that he didn't know the grievance process, he certainly did because he had filed a grievance back in August. of 2004. If you look at the second-minute complaint and what was decided by the lower court, there were only a handful of grievances that were actually at play. Let me ask you this question. Is there any evidence in the record of any written decision? Let's start with that. Anywhere? From the jail to Mr. Small? No. Okay. So surely a written decision. Is there any evidence in the record of any grievance officer's decision that was not in writing? A grievance officer's decision but not in writing. No direct evidence, sure. But if you look at the different incidents in 2005, there was an incident in June 18, 2005. He was complaining that he received a prison-issue wheelchair with no leg rests. And that's one of the ones I was talking about where the judge dismissed because he didn't appeal. Correct. But that isn't responsive to Judge Greenway's question. What I'm getting at, Your Honor, is that 10 days later he filed another grievance saying the wheelchair had been confiscated. So at some point he had gotten that wheelchair back within those 10 days. He wouldn't be complaining about it if he had gotten it back. Well, first of all, it doesn't matter, right, whether he's complaining about it anew because he got it back or whether it's a continuing complaint because he never got it because in either case there was no response. There was a response because he got the wheelchair back. There's another incident, I don't agree with you, that there was nothing in writing. I get your point. The response is one could infer that there must have been a response because he got the wheelchair. Correct. But that could be a reasonable or unreasonable inference, I suppose. You know, we could talk about that. But the point is... It's not. We've talked about it. But the point is, with regard to none of these, is there a compliance by CCCF with its own handbook? That's the issue that we're grappling with. I would say in many instances there is evidence of a compliance because he got his wheelchair back, Your Honor. But that's not what the handbook requires. Yes, and unfortunately, and Lieutenant Carroll did testify that there was a computer system at the jail that crashed and she was unable to locate any possible replies to his grievances. All those years? No. Correct. I'm not suggesting that they were decided but the computer crashed and the decisions were lost. I have no idea. I would just be speculating. Because her response was, I know that we provide responses but I don't know of any particular responses with regard to this particular individual and any grievances that he filed, right? Correct. I believe that's what she said. But I would just like to reiterate the point that the wheelchair was never taken for punitive reasons. Lieutenant Taylor testified very clearly and the court below assessed her credibility as to her interactions with the plaintiff. She was smashing the wheelchair into the wall. She was smashing the wheelchair into other people and they couldn't keep up with the repair of the wheelchair. Does that go to exhaustion or does that go to the merits? It goes to, I think it goes to both. I mean, you have to consider that as part of the continuing violation doctrine. That only, that's only invoked as the wheelchair incident after April of 2006. Correct. So you have a lot of things before then. Well, again, getting back to the point that I mentioned initially, we're only talking about a handful of incidents that the judge did not summarily dismiss because no grievance was filed at all. We're talking about the fact that he didn't, that they didn't respond to the... The judge finally, on June 18th, June 18th and June 28th, when he said it was formally grieved but there was no appeal. That's why he was very careful to pass that out. That's correct, Your Honor. That is correct. He did not file an appeal, but he knew that he could file an appeal to the jury. How do you appeal when there's no decision? Going back to that, he formally grieved, the judge said so on those two. He formally grieved there was no decision, but he didn't appeal now because of grief. He formally grieved where there was no decision. He formally grieved where there was no decision. How does one do that? What is there to appeal? At some point, he definitely could have filed an appeal. If he didn't receive no response, he could have filed an appeal, but in those two cases, he had his wheelchair back before the time was up. Well, I think you're repeating yourself a little bit at this point, so maybe it's time to... Thank you, Your Honor. May I just address one other issue? Sure. I can't say. You have to say. Sure, go ahead. Mr. Stahl was discussing the 8th Amendment. This is the 14th Amendment because he was a pretrial detainee at our jail, so the 8th Amendment would not come into play with the 14th Amendment.  Yes. Thank you. Thank you. Thank you. Thank you. Thank you. Good morning, Your Honor. Good morning, Your Honor. Thomas Stecker from the Department of Law, representing what has been called the Emergency Medical Defendants, Dr. Pettis, Dr. Hallander, and Nurse Adams, and the two administrators, Mr. Scofield and Ms. Stahl. The... Do you adopt everything that she said? Well, a lot of what is involved in the discussion of her clients, I respect and suggest don't apply to mine, simply because of the nature of the complaints and the manner in which Mr. Stahl addressed the issues that he had with my clients. There are a total of six counseling complaints that relate to my clients, three of which the appellant in this case has conceded that Mr. Stahl did not properly grieve, so we're left with three. Chronologically, the first one was on July 8, 2006, and in the complaint, it's the first... It's been a year since Mr. Stahl complained about anything. Is his son in jail, by the way? He's in state prison in Toronto. Does he have his jail certificate? I don't know. It depends on whether you're predicting him against the wall or using it to assault prisoners, I suppose. The same thing might be happening there, I don't know. I don't know. When we took his deposition in that facility, he was in a wheelchair. Yes? With leg rest? I don't remember. I don't remember. That was many years ago. Well, I would just parenthetically say this, that in my former life a thousand years ago, my first two years in the United States District Court were in the Trenton Visage and in the shadow of what was then called Trenton State Prison. And one third of our case load was prisoner civil rights litigation. And so I kind of understand a little bit about what the judges in these visages have to do. And I must say this, and I don't think Ms. Bennett would disagree, whether she was right all the way across the board. Well, only as to certain things, Judge Bump did a very thorough job here. Correct? I agree. He's an athlete. He spent two days on it. No, this is a very, the prisoner himself made it, and the state, not the medical defendants, made it difficult because of the volume of stuff he was firing. And that's a reality, isn't it? It is a reality. We're passing out this stuff, and this is three incidents in which the medical, this is very difficult stuff. I think 10% of the inmates take up 90% of the time. There was one one day, a full-time state attorney representing him, representing the one defendant, Dr. Alaudi Mohamed. It was full-time litigation. Yes, I'm not suggesting this is small. It was a bath. That's okay. Well, there's a lot going on. And why didn't anybody ever say or decide anything here? What are you inspecting on, I'm sorry? The decisions. I mean, the medical, we don't control the process in terms of handling the grievances. We become the subject of them, perhaps, but we don't deal with it. We just try to... But he committed an excessive force claim to go forward as to Whittick, and then that settled, correct? But there were still medical claims as to him. They were all dismissed in this procedure before the Whittick case settled. Whittick settled after this hearing. Okay. But there were no medical claims against Whittick. No. So why the excessive force claim? I don't know. I'm not sure about that. I didn't pay as much attention to that. Okay. So the first complaint against my client since July of 1806, there had been a year when there was nothing going on.  He submits letters. And if we try to give, if we say, okay, this letter occurred on July 8 when he was supposedly confiscated, his wheelchair was confiscated for two days. Well, you know, a few moments ago, your colleague argued that we should look to this informality that is alluded to in the handbook, that if we are to adopt that, wouldn't these letters constitute an informal bringing of notice to the attention of CCCF? I'll accept that. I don't even dispute that point. My point simply is that they are submitted every 15 days. They're submitted four weeks and five weeks later. And in violation of the grievance procedure, they grieve multiple incidents. They're not just focused on one. The grievance procedure says you grieve one incident at any one time. They were multiple. They were late. So that the July 8 incident, which consisted of a two-day confiscation of a wheelchair, is a discrete incident. The first thing that happened to him in over a year. So as a result of that, that was not properly grieved, even if we called the letter an appropriate grievance. So I'll accept that for the purpose of argument. Well, if it wasn't properly grieved in the sense that it was late, you'd agree that it wasn't properly responded to because there was no written response. But once it's late, it's late. So once it's late, it just can stay in another world. I think it can. I think he's got an obligation to file it within 15 days. That's what it says. And if they come back to him and said, Mr. Small, we're sorry it's late. And it's clearly in violation of the grievance procedure. And let's assume he got that in writing and he appealed it. It seems pretty clear that it's an appropriate denial of the grievance in terms of the time and the substance because it had multiple issues. We're talking about exhaustion. Sure, if all those things happen, sure, you get to the merits of the appeal, but what did the district court rule? The district court ruled that he didn't exhaust. He did not exhaust. And as to that particular incident, he didn't exhaust because he didn't follow the procedure for letters late. That's what I'm saying. She's saying he didn't exhaust because he didn't appeal. And our problem with that is he didn't appeal because there was no written decision. On the July 8th morning, I thought on the July 8th morning it was because he did not properly grieve. He did not file the grievance. Yeah. I think that's right. He writes a letter. He writes it on a bonus day. He can grieve on grievance form, not for a letter, but on plain white paper. But he's told him he must grieve too, which it goes to the grievance officer. A letter to people outside the prison and a letter to other places is not in compliance with the policy. In addition to the fact that he must do it within 15 days. And he just found that. Correct. So I don't think that was an appeal issue on the day. I think that was not an appeal issue. I believe that was as to that. Because it was late. It was to the wrong person. And the judge did not address, but I think it's pretty clear, that this policy said that the grievous procedure says you have to only grieve one incident at one time. And he did not. In those letters, if we call those letters grievance. Is that July 7th? There were two from the same grievance. Well, July 7th. July 7th was a grievance. No appeal. No grievance form of file. Letter to Schofield cannot be construed as a grievance because the grievance must be directed to the grievance officer. And the letter to Warden Taylor cannot be construed as an appeal because no grievance file. And the judge did not rule on the issue, but I think in addition to that, it could have easily been said, because it's clear, it's over 15 days. The August 8th and August 14th letters are late. So you're July 8th, those are the three instances. July 8th is the date that he says it happened. The letters are dated August 8th, August 14th. She never, she did not go up on that graph. She just stopped at the point where they went to the wrong, they were not agreements to the appropriate person. And I'm saying, let's be liberal about it. Let's just say, arguments say it went to the right person. Let's just say it only had one incident addressed in it, which is in violation of the policy when it has more than one. And 15 days is 15 days. We can take judicial notice of that. I suggest that you can. With regard to the three incidents. With regard to July 8th, the same occurs as to July 10th, which I haven't, excuse me, yes, July 10th. That's when Dr. Pettis then allegedly replaced the wheelchair without leg rests. Again, what happened in response to July 10th, Mr. Small's counsel took the position that the exact same letters of August 8th and August 14th constitute the grievance. Okay, forget about it. Now, Judge Bunk said they went to the wrong person. I'm saying, even if we accept they went to the right person, they're still late. Because now it's a discrete incident. Not that I don't have one. I think Dr. Pettis gave me one, but it didn't have foot rests, so it's a discrete incident. If there was an informal grievance, is there a time frame for that? There's a time frame. 15 days deals with the grievance. Right, but the grievance, which is given to the grievance, is not a letter to somebody. That's correct. So I'm not so sure. Judge Bunk focused on who the letter went to. I'm not giving up on that. But the handbook says who it should go to. Absolutely. But I was sort of fashioning my argument around your comments that if we accept that it can go to another administrator, not the warden, it's still late. Yeah, but here's what I don't get. If we adopt the suggestion of your colleague, we don't go back to 15 days, because, I'm going to tell you why. I mean, it's your suggestion you're talking about. I'm talking about informality, which is picking up on Judge Barry's point. It's not too late to follow informal procedures. When you look at the informality notion, there is no time limit. So if you look at the letter that you've been talking to as it relates to the July 8 incident, it's not late if it's informal. You can say, yes, it doesn't follow our grievance procedures. And I'm picking up on her point. I think they're separate things, though, aren't they? I see where you're going. I'm not saying it's the 15-day notion. It doesn't make sense informality notion. I think what they're suggesting is that, look, come to us right away if you've got a problem. And if it's not worked out, you've got 15 days to file a written grievance. That's the logical way of moving them together. I think we try to move them together. That makes more sense to me. I don't know. Yes. You don't want to take a bath. You're not having so much fun. It's a ball. So the last medical issue, and there's only three, is the August 10th issue. I thought you conceded. Not August 10th. August 6th. They conceded August 14th. August 6th is the issue there's a complaint about him bleeding because of using the catheter. When he testified at the hearing, Mr. Small admitted that he didn't agree with the August incident. That's the incident that happened in Urbana-Lopez 19-20-23. He didn't get the catheter. They got a catheter and they're bleeding and it wasn't addressed. On page 304 of the appendix when he was testifying he said he didn't submit agreements. What we relied upon at the hearing again were letters written to Josephine Curls and Steve Schofield not to the administrator and again those letters if we consider them to be grievances because they're sent to the wrong person they address more than one incident in them. There were multiple complaints as Mr. Small was sort of typical. He goes on and on and on and complains about a lot of things. So it would be defective but it's timely. That one would be timely. Sure. That one would be timely. I'm not raising the timeliness issue there. I'm raising who it went to and I'm raising the fact that it does not follow the procedure because it addressed just more than one. It had five different complaints in a lengthy letter and I'm way out of time. That's all right. I was going to address the issue of the appropriateness but I don't want to cancel that. I'm good. Thank you very much. Thank you. That's a great question. Thank you. Yeah. I guess I just have one more letter. I would like to address you to the topic of page 675 which quotes the language of the Indian handbook that it means it's an inappropriately filed grievance. I would like to go over it quickly. I'm so sorry. If you say the name of the book let us speak. All right go ahead Will. An inappropriately filed grievance or one that is directed to the nation that is inappropriately filed in any way none of them will ever return to Mr. Small for correction. Is that what it's supposed to be for a correction? Does it say that? It does not say for a correction. It says they will be returned to you. None of Mr. Small's grievances if they were improperly filed which we do not conceive they were will ever return to him. And so what do we do with that fact? If Mr. Small does not follow his own grievance procedure then how can we learn Mr. Small's grievance? Are you asking us? I'm so sorry. Mr. Small cannot do the same. No. We have spent an hour an hour trying to figure out what is going on with these 14 grievances. I mean this is just what would you have how can we send this back to her? She's done it once. We're picking it to death. She is the district court. She is the district court. We're picking it to death. Do you want us to send it back so she can continue to the district judge can continue to pick at it and deal with time limits? I don't know what we're supposed to do. I would like this court to find that Mr. Small did not fully exhaust his administrative remedies and let the district court hear his case on the merits. Respectfully. Unless the court is and the merits are what? That he didn't abuse his wheelchair? I'm not sure what where do you focus this case? I agree with Judge Barrett. I think the merits are going to go to his deliver indifference claims. So the continued confiscation of his wheelchair he was alleging that well suppose he did in fact misuse the wheelchair and hit other inmates with it. Suppose those were the facts. My guess is they probably are at least partly the facts. So what do we do? Send it back to Judge Barrett for what? So Mr. Small can have a federal court hear his constitutional claims in order. Even if his claims are not meritorious that's for the district court to decide. Well as of now in my reading of the record seems no facts that would dispute the record for discovery and this was not a motion for summary judgment I can assure you. But it doesn't seem to me that he hasn't really disputed his conduct which led to the confiscation or the inadequate replacement of the wheelchair and his couple of other claims are not wheelchair claims. He doesn't seem to dispute that. That's fair Your Honor but again that doesn't go into whether or not he exhausted and  and she's saying send it back to us. It's a constitutional claim but are there any facts to dispute his misuse of that wheelchair? I have not yet. I see. I'm surprised not yet those facts are unavailable to us. The discovery is completed now. Maybe the judge wasn't doing wasn't hearing this on the merits so I don't understand. She got an idea of what was going on. I go back to the question I asked a while ago which is what do you want us to do? You want us to say he's entitled to money which he'll use in prison to do what? To get more paper. Your Honor we respectfully ask that this court find that Mr. Small exhausted his administrative remedies and also to find that prison officials do have to respond timely to grievances to measure the administrative remedial scheme available to prisoners. That's what we ask from you today. Is there a position that we should do something about all 14 crimes? All nine grievances that are in our opening brief Your Honor. So there are 14 crimes in the second complaint but the nine that we did not concede yes that's wrong.  We do want to say that you are doing this as a volunteer and we appreciate that that somebody is doing this and we appreciate  that somebody is taking up for the prisons. Prisoners. Yeah. All counts for this part of the job but I do want to kudos to you for doing such a fine job while you were in law school and now you're in law school where you're doing. Thank you so much for doing such a fine job. Thank you. I appreciate it.